# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DEBRA D. MADDOX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-342-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>OPINION AND ORDER</u>

Claimant, Debra D. Maddox ("Maddox"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Maddox appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Maddox was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Maddox was 47 years old at the time of the hearing before the ALJ on January 9, 2009. (R. 29). Maddox had completed the tenth grade. *Id.*

Maddox testified that she last worked in August 2006 doing collection work by telephone. (R. 30). She quit due to severe pain that made it difficult to sit all day, including pain in her feet, knees, hips, elbows, hands, wrist, and neck. *Id.* Pain kept her from working. (R. 47). She said the pain was caused by rheumatoid arthritis. (R. 30). She had worked for about one year with her arthritis. (R. 31). Maddox said that the rheumatoid arthritis diagnosis had been made by a rheumatologist. *Id.* A second rheumatologist had treated her with IV treatments in his office that she took once a month for 12 or 13 months before she left her job and no longer had insurance. (R. 31-32). Maddox testified that her condition had deteriorated since she left her employment in August 2006. (R. 36).

Maddox testified that, after she lost her insurance, she went to providers such as Morton that continued her prescriptions of Prednisone, Cymbalta, and Lexapro for depression. (R. 32). She was on more than one prescription pain medication as well. *Id.* She used heating pads to help relieve her pain, and she slept a lot, too. (R. 33).

Around January 2007, she sought treatment for depression because she could not stop crying. *Id.* Maddox testified that she originally saw a therapist, Leah Hunt, for treatment of her depression who donated her time, but she then began counseling at Family & Children's Services ("F&CS") every other week. (R. 34). The F&CS physicians prescribed Seroquel which caused an adverse effect of swelling throughout her body. (R. 35). She continued to take Lexapro, but at an increased dosage. *Id.*

When asked how much she could lift for two to three hours five days a week, Maddox estimated that she could lift four or five pounds. (R. 36). Her elbows, shoulders, wrists, and hands would prevent her from lifting more than that. *Id.* She thought that she could sit for about 20 or 30 minutes before her hips would begin to radiate pain. (R. 36). At that point, she would have to take a Darvon and change positions. *Id.* Maddox thought that she could sit for about two hours a day total five days a week. (R. 37-38). She testified that she could only walk for about half a block before her hips would "go out," her knees would hurt, and her feet would be "soft and squishy." (R. 38). She had just begun to use a cane that had been given to her. (R. 46-47). She used the cane to go down to the basement and back up the stairs. (R. 47).

Maddox testified that she could not dress herself, and she had a roommate who assisted her with bathing and dressing. (R. 38). She had swelling in her hands, and she had trouble picking up small objects. (R. 45). Activity such as writing, typing, or doing dishes caused swelling. *Id.*

She had a driver's license but only drove out of necessity to attend her doctor's appointments. (R. 39). Her roommate drove her to the hearing. *Id.* Her roommate did the meal preparation, the grocery shopping, the yard work, and most of the housekeeping. (R. 39-40). Maddox did light dusting, and she cleaned the cat's litter box. (R. 40). Maddox also straightened up the house by putting things back where they belonged. *Id.*

Maddox testified that she slept with her heating pad both at night and during the day. (R. 37). She testified that she had swelling in her elbows, shoulders, wrists, and hands every morning for two or two-and-a-half hours. (R. 36). She sat still until her Prednisone had taken effect. *Id.* She also used ibuprofen. (R. 37). She slept from about 10:30 a.m. to 3:30 p.m., and she then felt better. *Id.*

Maddox testified that her depression caused crying spells. (R. 40). She had previously experienced suicidal thoughts, but she no longer had those thoughts at the time of the hearing. *Id.* She had difficulty with concentration. (R. 41). She was depressed every day. (R. 45).

Maddox testified that the rheumatoid arthritis affected her eyesight as well. (R. 41). She testified that she could not read magazines, and she did not watch television, although she listened to the news. *Id.*

Maddox said that she woke at 5:45 a.m. each morning and took her medication. *Id.* She woke her roommate and drove her to work, which was only a five-minute drive. (R. 41-42). When she drove, she used gloves to help her grasp the steering wheel and to lessen the impact on her joints. (R. 46). She then worked at the computer for thirty minutes. (R. 42-43). Her use of the computer was "looking" more than typing. (R. 46). She could only type with two fingers, and it was uncomfortable. *Id.* Then she rested and took her nap at 10:30 a.m. (R. 43-44). She got up at 3:30 p.m. when her alarm went off, and she would prepare to drive again. (R. 44). She might need to take a Darvon to help with stiffness. *Id.*

Maddox testified that she had no hobbies and did not participate in activities such as going to movies or going out to dinner. *Id.*

Medical records show that Maddox saw Laurel Williston, M.D. with Family Medical Care of Tulsa on July 14, 2004 and reported that BuSpar and clonazepam had been helpful in making her able to focus at work, but she was experiencing anxiety again. (R. 267). Dr. Williston adjusted Maddox's medications, assessed unspecified anxiety state, and encouraged her to continue counseling. *Id.* A laboratory report from January 2005 appears to state that Maddox had a positive rheumatoid arthritis test, and a hand-written note said to "forward these & 12/18/03 results to rheumatologist." (R. 305).

Maddox was seen on February 22, 2005 by Timothy L. Huettner, M.D. with Rheumatology Associates on referral from Dr. Williston. (R. 294-97). Dr. Huettner's impressions were inflammatory arthritis, osteoarthritis, and degenerative cervical disc disease. (R. 295). Dr. Huettner had the same impressions at a follow-up appointment on May 9, 2005. (R. 291-92). On June 7, 2005, Dr. Huettner said that Maddox was being treated with Methotrexate every Monday, and that he would increase her dose if blood tests showed no contraindication. (R. 288).

On September 20, 2005, Maddox returned to Dr. Williston's office with a complaint of increasing anxiety. (R. 259-60). Insomnia was assessed in addition to anxiety, and Ambien was prescribed. (R. 260).

On October 5, 2005, Maddox returned to Dr. Williston with continued insomnia and a request to see a different rheumatologist. (R. 254-55). Dr. Williston prescribed Lunesta. (R. 255). Dr. Williston signed a Certification of Health Care Provider under the Family and Medical Leave Act of 1993 stating that Maddox's rheumatoid arthritis caused intermittent severe pain and disability. (R. 281-83).

Maddox was seen by James D. McKay, D.O. with The Oklahoma Center for Arthritis Therapy & Research, Inc. in October 2005. (R. 278-79). His impressions were historical rheumatoid arthritis, history of dysphagia, anxiety, and steroid dependence. (R. 278). Maddox was treated with Remicide at Dr. McKay's office from October 2005 through December 2006. (R. 379-462).

On January 10, 2006, Maddox saw Steven R. Wiseman, M.D. to establish care. (R. 316-17). On February 24, 2006, Maddox returned for a rheumatoid arthritis flare, joint pain, and cold intolerance. (R. 497-98). Dr. Wiseman assessed rheumatoid arthritis and depression. (R. 498).

On September 16, 2006, Maddox was seen at the emergency room at Tulsa Regional Medical Center for abdominal pain. (R. 575-87). She was dismissed after she felt better and advised to follow up with her primary care physician. (R. 577).

On March 28, 2007, Maddox returned to Dr. Wiseman for continued treatment of depressive disorder. (R. 509-10). Dr. Wiseman assessed major depressive disorder and said that Maddox had a good response to current treatment. (R. 509).

Maddox was seen at Morton Comprehensive Health Services (the "Morton Clinic") on July 18, 2007, by a certified physician's assistant. (R. 534-35). Her chief complaint was pain in both legs and feet. (R. 534). Diagnoses were rheumatoid arthritis "per pt," insomnia, anxiety, and smoking cessation. (R. 535). On December 31, 2007, Maddox was seen by Michael Opong-Kusi, D.O., and his assessments were "diagnosed rheumatoid arthritis and possibly other immune connective tissue disease," "chronic pain, presumed fibromyalgia," and depressive disorder. (R. 526-27). He continued her prescription medications, referred her to F&CS for psychiatric counseling and medication assistance, and referred her to the Center for Individuals with Physical Challenges for physical therapy and conditioning. (R. 527).

Maddox saw Dr. Opong-Kusi again on February 6, 2008, and assessments were rheumatoid arthritis, presumed connective tissue disease, chronic pain with history of fibromyalgia, and history of depression. (R. 522). He added Neurontin to Maddox's medications. *Id.*

Maddox returned to the Morton Clinic on March 14, 2008 with facial swelling and asked that laboratory tests be done. (R. 609). She attended a follow-up appointment with Asim Maqsood, M.D. on April 1, 2008, and he said that her laboratory results were normal, given her prescription medications. (R. 607-08). Assessments were history of rheumatoid arthritis on

chronic prednisone, chronic pain with a history of fibromyalgia, and history of anxiety and depression.  (R. 607).  Maddox was tearful, complained of pain throughout her body, and asked for clonazepam and Darvon.  *Id.*  Maddox had received refills in early March for these medications, and when the physician tried to discuss those with her, her friend became loud and cursing.  *Id.*  Dr. Maqsood recommended follow up with a rheumatologist, a pain specialist, and a psychiatrist.  (R. 608).  He did not refill clonazepam and Darvon, but he refilled Prednisone. *Id.*

Maddox saw Dr. Opong-Kusi for follow-up on April 11, 2008, and he advised her to taper from Neurontin, and he referred her to Dr. McKay for a rheumatology consultation.  (R. 605-06).  On May 20, 2008, Maddox reported that she could not afford to see the rheumatologist due to lack of insurance.  (R. 604).  Dr. Opong-Kusi advised Maddox that "we need to taper some of her pain meds.  I stressed she should take the Ultram and Darvon as needed and not to exceed the recommended dose."  *Id.*

Maddox was seen at F&CS for an initial Psychiatric Diagnostic Evaluation on August 26, 2008.  (R. 638, 689).  The physician diagnosed Maddox on Axis I[1] with bipolar II disorder, panic disorder without agoraphobia, and post traumatic stress disorder ("PTSD").  *Id.*  On Axis II, the physician noted that there were "many cluster B traits."[2]  *Id.*  She assessed Maddox's current

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2] Cluster B personality disorders are antisocial personality disorder, borderline personality disorder, histrionic personality disorder, and narcissistic personality disorder.  DSM IV 701-17.

Global Assessment of Functioning ("GAF")[3] as 49, with a highest GAF in the past year of 59. *Id.* Maddox apparently began counseling at F&CS in September 2008 and continued through December. (R. 642, 646-49, 690-94).

Maddox was seen at the Oklahoma State University Medical Center on September 30, 2008 for follow up of a cough and for generalized pain. (R. 541-58). The physician's impressions were acute bronchitis and acute exacerbation of chronic pain, and she was given medication and discharged. (R. 545).

Maddox was seen as a new patient at the OU Bedlam Clinic on November 14, 2008. (R. 626). Maddox was seen again on December 19, 2008 for pain management. (R. 662). She was assessed with rheumatoid arthritis with steroid dependency, and she was prescribed Flexeril, given a refill of Darvon, and told to wean Klonipin. *Id.* On January 26, 2009, she was seen by L. Janelle Whitt, D.O. for follow up. (R. 671-74).

Maddox saw Jeffrey Cates, D.O. at F&CS on February 17, 2009 for pharmacological management. (R. 695-96). Dr. Cates diagnosed Maddox with PTSD and generalized anxiety disorder, with a provisional diagnosis of bipolar disorder. (R. 695). He adjusted Maddox's medications. *Id.* Maddox saw Kristy Griffith, M.D. on October 26, 2009. (R. 697). Maddox told Dr. Griffith that she was not taking any of the medications previously prescribed at F&CS

---

[3] The GAF score represents Axis V of the multiaxial assessment system. *See* American Psychiatric Association, DSM IV 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

because she could not tolerate them. *Id.* Maddox was seen by Sarah Land, D.O. at F&CS on December 8, 2009. (R. 698). Dr. Land diagnosed her with PTSD and depressive disorder not otherwise specified, and she noted that Maddox might have some symptoms similar to mania due to her use of Prednisone. *Id.* Dr. Land prescribed Vistaril. Maddox saw Dr. Griffith on December 17, 2009 and said that her anxiety was improved on Vistaril, and she requested an increased dose. (R. 701).

Maddox was evaluated by agency consultant Angelo Dalessandro, D.O. on November 27, 2006. (R. 364-70). Her chief complaint was arthritis. (R. 364). Dr. Dalessandro observed that Maddox had a normal gait and had no difficulty in getting on or off the examination table. (R. 365). He noted that Maddox had a flat affect. *Id.* Dr. Dalessandro said that there was no edema or discoloration of Maddox's extremities. (R. 365-66). Maddox's feet were tender, and both shoulder joints were tender but had normal range of motion. (R. 366). Maddox also had tenderness of the lower back. *Id.* He noted that Maddox appeared to have a weak heel-and-toe walk. *Id.* Dr. Dalessandro's first impression was to rule out rheumatoid arthritis, and his second was gastroesophageal reflux disease. *Id.*

Agency nonexamining consultant Thurma Fiegel, M.D., filled out a Physical Residual Functional Capacity Assessment January 25, 2007. (R. 486-93). Dr. Fiegel found that Maddox had the exertional capacity to perform light work. (R. 487). In the space for narrative explanation, Dr. Fiegel acknowledged that Maddox had a treating history and current treatment for rheumatoid arthritis. *Id.* She briefly summarized Dr. Dalessandro's consultative examination and report. *Id.* She found Maddox had no other physical limitations. (R. 488-93).

Agency consultant Tre' Landrum, D.O. completed a second physical examination and report on October 15, 2007. (R. 516-17). Dr. Landrum observed that Maddox cried throughout

the examination. (R. 517). Maddox moved all extremities well and was able to pick up and manipulate paperclips without difficulty. *Id.* She moved about the room easily and had full range of motion of her spine. *Id.* Her toe and heel walking was normal, and her gait was stable, with appropriate speed, and without any assistive devices. *Id.* Dr. Landrum's assessments were rheumatoid arthritis and depression. *Id.*

Agency consultant Denise LaGrand, Psy.D. conducted a mental status examination on November 16, 2006. (R. 371-76). Dr. LaGrand recounted Maddox's reported history and symptoms in detail. (R. 371-73). Dr. LaGrand estimated Maddox's IQ to be in the low average range, as was her ability to understand, remember, and carry out instructions. (R. 375). Her ability to concentrate also appeared to be in the low average range, and Dr. LaGrand noted no problems with persistence or pace. *Id.* Dr. LaGrand concluded that Maddox would have a fair ability to be reliable, deal with the public, and function independently. *Id.* She said that Maddox's ability to perform adequately in most job situations, to handle the stress of a work setting, and to deal with supervisors and co-workers would be below average. *Id.* Dr. LaGrand diagnosed Maddox on Axis I with pain disorder and moderate major depressive disorder. *Id.* She assessed Maddox's GAF as 50. (R. 376).

Janice B. Smith, Ph. D., an agency nonexamining consultant, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on January 24, 2007. (R. 464-81). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Smith noted Maddox's depressive syndrome. (R. 467). For Listing 12.07, somatoform disorders, she noted Maddox's pain disorder due to general medical condition. (R. 470). For the "Paragraph B

Criteria,"[4] Dr. Smith found that Maddox had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 474). In the Consultant's Notes portion of the form, Dr. Smith reviewed Maddox's complaints, her tearful demeanor when initiating her disability claim, and her treatment records. (R. 476). She also summarized Dr. LaGrand's consultative examination. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Smith found that Maddox was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 478). She found Maddox to be moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to interact appropriately with the general public. (R. 478-79). She found no other significant limitations. *Id.* Dr. Smith gave the following narrative statement of Maddox's abilities:

> Claimant is able to understand, remember, and carry out simple one-step tasks and some, but not all, more detailed tasks that do not require intense concentration. She is able to work under routine supervision. She is able to complete a normal work day and work week, and she can adapt to a work setting. She is able to relate on a superficial basis to the general public, coworkers, and supervisors for work purposes.

(R. 480).

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

After the hearing before the ALJ, Maddox was examined by agency consultant David B. Brinker, M.D. of Northwest Eye Physicians on February 20, 2009. (R. 659-60). In his cover letter, Dr. Brinker explained that Maddox was developing a cataract in her left eye that is characteristic of long-term steroid use. (R. 659). He said that it was expected that this cataract would "rapidly become much worse and bilateral," and he said that Maddox would need surgery. *Id.* He said that this kind of cataract caused blurring in bright light. *Id.* Dr. Brinker's hand-written notes are difficult to read, but it appears that Maddox's vision could be corrected to 20/30 in her right eye and to 20/80 in her left eye. (R. 660). He said that Maddox's right eye was "clear." *Id.* Dr. Brinker's notes of the examination appear to show that Maddox's vision was normal other than the cataract developing in Maddox's left eye. *Id.*

Leah Hunt, MSW completed a Mental Medical Source Statement dated May 1, 2007. (R. 651-55). In 20 functional categories, Hunt indicated that Maddox had no significant limitation in 5 categories, moderate limitation in 3, marked limitation in 5, and severe limitation in 7. She did not include any narrative comments.

Hunt wrote a "To Whom It May Concern" letter dated January 5, 2009. (R. 657). Hunt indicated that she had been seeing Maddox for outpatient therapy since February 2006. *Id.* She stated Maddox's diagnoses as bipolar, severe, with psychotic features, and attention deficit disorder, severe. *Id.* She said that Maddox's physical issues aggravated her mental health issues, and she said that Maddox was unable to function outside of her home. *Id.*

Nancy Grayson, M.D., psychiatrist, completed a Mental Medical Source Statement dated April 7, 2009. (R. 676-79). For the 20 functional categories, Dr. Grayson indicated that Maddox had no significant limitation in 1, moderate limitation in 6, marked limitation in 6, and severe limitation in 7. *Id.* For narrative comments, she wrote "see report." (R. 679). An accompanying

report stated that the evaluation had taken place on March 26, 2009. (R. 680-84). She said that she completed the Mental Medical Source Statement after her interview and review of records, and she explained that she generally agreed with Leah Hunt. (R. 682). Her diagnoses on Axis I were bipolar I disorder and adult attention deficit hyperactivity disorder. *Id.* On Axis II, she diagnosed histrionic personality traits. *Id.* In a hand-written addendum, she stated that Maddox met Listing 12.04. (R. 686).

Amy Branscum, BA, CM, of F&CS wrote an undated report regarding Maddox that gave extensive narrative of Maddox's reports of her physical and mental conditions and of her functional limitations. (R. 713-15). The report also included Branscum's observations of Maddox's physical problems, including that Maddox walked slowly, with a "shuffling" gait and a slight limp. (R. 714). She said that Maddox could not sit for more than an hour, and she had difficulty carrying heavy objects. *Id.*

### Procedural History

Maddox filed applications in August 2006 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 112-21). Maddox alleged onset of disability as May 2, 2006. (R. 112). The applications were denied initially and on reconsideration. (R. 58-66, 74-79). A hearing before ALJ Lantz McClain, was held January 9, 2009 in Tulsa, Oklahoma. (R. 26-52). By decision dated July 29, 2009, the ALJ found that Maddox was not disabled. (R. 14-24). On April 8, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Maddox met insured status through December 31, 2011. (R. 16). At Step One, the ALJ found that Maddox had not engaged in any substantial gainful activity since her alleged onset date of May 2, 2006. *Id.* At Step Two, the ALJ found that Maddox had severe impairments of rheumatoid arthritis, poor vision in one eye, degenerative disc disease of the cervical spine, pain disorder, and depression. *Id.* At Step Three, the ALJ found that Maddox's impairments did not meet a Listing. (R. 17-18).

The ALJ determined that Maddox had the RFC to perform light work except "limited to simple repetitive tasks and incidental contact with the public." (R. 18). At Step Four, the ALJ found that Maddox was unable to perform any past relevant work. (R. 22). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Maddox could perform, taking into account her age, education, work experience, and RFC. (R. 23-24). Therefore, the ALJ found that Maddox was not disabled at any time from May 2, 2006 through the date of his decision. (R. 24).

## Review

Maddox makes four arguments that the ALJ's decision should be reversed. First, she faults the ALJ's analysis of the opinion evidence. Second, Maddox argues that the ALJ's decision at Step Five was faulty. Third, Maddox faults the ALJ's credibility assessment. Fourth, Maddox states that the record is not complete. Regarding the issues raised by Maddox, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

## Opinion Evidence

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The Tenth Circuit explained the requirements of an ALJ in relationship to opinion evidence from an "other source" in *Frantz v. Astrue*, 509 F.3d 1299, 1300-01 (10th Cir. 2007). In *Frantz*, the claimant was diagnosed with bipolar disorder, and the Tenth Circuit found that the ALJ did not properly consider opinion evidence from a clinical nurse specialist who had indicated that the claimant could not work due to numerous symptoms of her mental illness. *Id.* While the nurse was not an "acceptable medical source," she was an "other source," and the ALJ was required to discuss her opinion evidence and to describe the weight he gave to that evidence.

Here, Maddox's first argument is that the ALJ's treatment of Leah Hunt's opinion evidence was inadequate. Hunt's evidence consisted of the Mental Medical Source Statement dated May 1, 2007 and the "To Whom It May Concern" letter dated January 5, 2009. (R. 651-55, 657). These documents indicated that Hunt's credentials were "MSW," a master's degree in social work, which makes her an "other source" rather than an acceptable medical source.

*Frantz*, 509 F.3d at 1301, *citing* 20 C.F.R. § 404.1513(d)(1).  The ALJ did not ignore these documents, but gave a detailed description of their contents.  (R. 21-22).  The ALJ, however, did not then give an explanation of why he rejected her opinion evidence, which he obviously did, given that his RFC determination did not reflect Hunt's opinions.

The ALJ should have given an explicit discussion of the weight that he gave Hunt's evidence.  *Frantz*, 509 F.3d at 1302.  Here, however, the totality of the ALJ's decision makes his reasoning adequately clear.  As the Tenth Circuit recently explained in affirming the portion of an ALJ's decision addressing opinion evidence:

> Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.  In conducting our review, we should, indeed must, exercise common sense.  The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.

*Keyes-Zachary v. Astrue*, ___ F.3d ___, 2012 WL 4076114 *6 (10th Cir.).  *See also Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("the form of words should not obscure the substance of what the ALJ actually did"); *Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated on his treatment" of opinion evidence, the ALJ's decision was adequate).

Here, it is evident that the ALJ's reasons for rejecting Hunt's evidence were closely linked to his reasons for rejecting the evidence of Dr. Grayson, who was an acceptable medical source.  Maddox's second argument relating to the ALJ's discussion of the opinion evidence was that the ALJ's reasons for rejecting Dr. Grayson's opinions were not adequate.  In his decision, the ALJ first described Dr. Grayson's Mental Medical Source Statement and the addendum.  (R. 22).  He then stated:

> The opinions of Dr. Grayson are not given controlling weight as this is not a treating physician but an examining doctor. Her report was purchased for the purposes of this litigation and appears to be out of line with the medical evidence of record as a whole.

*Id.*

The undersigned finds that the first sentence of the quoted language from the ALJ's decision was meant to acknowledge the differing standards for consideration of examining opinion evidence compared to treating physician evidence. This sentence is not inaccurate, but it also does not give a specific reason for rejecting Dr. Grayson's opinion evidence, as required. *See Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished) *citing Doyal*, 331 F.3d at 763-64.

The ALJ's next sentence, however, gives two reasons for rejecting Dr. Grayson's evidence. First, the ALJ found that it was of questionable credibility because it had been "purchased" for purposes of the disability proceedings. The case cited by Maddox as stating that this is an improper reason for discounting an examining opinion does not actually stand for that proposition. *See Hinton v. Massanari*, 13 Fed. Appx. 819, 823 (10th Cir. 2001) (unpublished). The court in *Hinton* discussed this issue at some length and stated that "[a]n ALJ may certainly question a doctor's credibility when the opinion, as here, was solicited by counsel. [Citation omitted.] The ALJ may not automatically reject the opinion for that reason alone, however." *Id.*

The ALJ here, in addition to the reason that Dr. Grayson's opinion had been solicited by Maddox's attorneys, stated that it appeared to be out of line with the medical evidence as a whole. (R. 22). Maddox complains that the ALJ did not give any examples of how Dr. Grayson's evidence differed from the other evidence, and that therefore this reason is not adequate. The Court agrees, again, that more detail here would have been preferable to the extremely brief statement. *Keyes-Zachary*, 2012 WL 4076114, at *6. However, the Court finds

that it is reasonably clear that the ALJ was contrasting Dr. Grayson's evidence with all of the other mental health evidence: the treating records of F&CS, the examining report of Dr. LaGrand, and the opinions given by Dr. Smith on the forms that she completed. None of these sources reflect the extreme mental health issues and functional limitations that Hunt and Dr. Grayson describe in their opinion documents. For example, in discussing the Paragraph B criteria in reference to the question of whether Maddox met a Listing at Step Three, the ALJ found that Maddox had only moderate restrictions in her activities of daily living, mild difficulties in social functioning, and moderate difficulties with concentration, persistence, or pace, with no episodes of decompensation. (R. 17). This echoed the findings of Dr. Smith. (R. 474). These findings, while they were made in reference to the Listings, are not findings that would be expected for a person with the extreme functional limitations described by Hunt and Dr. Grayson.

Thus, in the specific facts of this case, the ALJ's reasons for rejecting Dr. Grayson's opinions as an examining source are adequate. *Aragon v. Astrue*, 246 Fed. Appx. 546, 549-50 (10th Cir. 2007) (unpublished) (ALJ gave specific, legitimate reasons for rejecting opinion of examining physician). Given the similarity of Dr. Grayson's opinion evidence and Hunt's opinions as an "other source," the Court finds that the ALJ's reasoning rejecting Dr. Grayson's opinions was intended by the ALJ to address Hunt's opinions also. The reasons given by the ALJ were adequate to reject Hunt's opinion evidence as well. *See Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished) (LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient); *Nichols v. Astrue*, 341 Fed. Appx. 450, 453-54 (10th Cir. 2009) (unpublished) (affirming ALJ's rejection of nurse-practitioner's opinion because "[a]lthough not expressly stated in [his] decision," the ALJ's findings were "reasonably clear").

Maddox asserts that the ALJ was required to discuss the observations of the Social Security Administration clerk that she had difficulty with her memory, spoke quickly, and cried. Plaintiff's Opening Brief, Dkt. #21, p. 6. The undersigned rejects this assertion, for which Maddox cites to two District of Kansas decisions. The ALJ's omission of this minor fact does not require remand.[6] *See Holcomb v. Astrue*, 389 Fed. Appx. 757, 760 (10th Cir. 2010) (unpublished) (ALJ was not required to discuss lower GAF scores that were "bits of information not essential to [the claimant's] RFC determination, inadequate to establish disability, and contradicted by an opinion from an acceptable medical source"); *Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require discussion).

While the ALJ did not explicitly cite in his decision the opinions of the nonexamining consultants, Dr. Smith and Dr. Fiegel, they provide substantial evidence supporting the ALJ's RFC determination. *Cowan v. Astrue*, 552 F.3d 1182, 1186-87 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished). The Tenth Circuit has often stated that the court takes the ALJ at his word when he states that he has considered all of the evidence. *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009). Here, the ALJ specifically stated that in determining Maddox's RFC, he considered all of the opinion evidence. (R. 18). The ALJ's decision was supported by substantial evidence, and there were no reversible errors regarding opinion evidence.

---

[6] Moreover, implicit in the ALJ's decision is his reliance upon the opinions of Dr. Smith, the nonexamining consultant, and Dr. Smith cited the observations of the clerk in her narrative. (R. 476). Thus, the ALJ relied on opinion evidence that incorporated the observations of the clerk, and this incorporation of the clerk's observations negates Maddox's argument.

**Step Five Issues**

Maddox asserts that the ALJ should have included some hand limitation in his RFC determination, but this argument is a request to re-weigh the medical evidence that the ALJ had before him.  First, two different agency consultants, Dr. Dalessandro and Dr. Landrum, examined Maddox and came to the conclusion that she had no problem with hand grip or manipulation of small objects.  (R. 366, 368, 517).  Second, Dr. Fiegel, the nonexamining consultant, found that no manipulative limitations were established.  (R. 488).  This was substantial evidence on which the ALJ was entitled to rely.  *Cowan*, 552 F.3d at 1186-87; *Flaherty*, 515 F.3d at 1071.

Maddox similarly asserts that the ALJ's RFC determination needed to have a limitation for her vision.  Again, there was substantial evidence supporting his decision not to include a vision limitation.  (R. 488).   The agency consultant who did the vision examination indicated that most parts of his examination were normal.  (R. 659-60).  Maddox's right eye could be corrected to 20/30, but her left eye could only be corrected to 20/80, presumably because her left eye was developing a cataract.  *Id.*  The examiner's report is not strong evidence that a visual limitation was needed, and Dr. Fiegel did not include a visual limitation in her assessment.  (R. 488).  Thus, the Court will not accept Maddox's invitation to re-weigh the evidence, when the ALJ's decision was supported by substantial evidence.  *See Miller v. Astrue*, 2012 WL 4076128 (10th Cir.) (unpublished) (omissions of limitations from RFC was not error when they were not borne out by record evidence).  Maddox gives specific requirements of the jobs that the ALJ used in his Step Five analysis as part of her argument that she could not perform these jobs due to her vision problems.  Because the Court finds that the ALJ's omission of a visual limitation in the RFC determination was not error, the vision requirements of the jobs used at Step Five are not relevant.  There was no error at Step Five.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ gave several reasons[7] for finding Maddox's testimony to be less than fully credible. (R. 21). The ALJ first said that the medical evidence of record did not show Maddox's problems to the degree that she alleged and that it appeared she was exaggerating her problems. *Id.* The ALJ later in that paragraph gave what the Court finds was intended to be one example, which was that x-rays of her hands showed no problems. (R. 21, 668, 670). Contrast between the claims of the claimant and the medical evidence of record is a legitimate reason for an ALJ to use in a credibility assessment. *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence"). While it would have been preferable for the ALJ to give other examples, this first reason supporting the ALJ's credibility

---

[7] Maddox faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 19). While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful. *See Keyes-Zachary*, 2012 WL 4076114, at *10 (use of boilerplate language in a credibility assessment is problematic only "in the absence of a more thorough analysis") (further quotations omitted).

assessment was legitimate and was linked to substantial evidence.

The ALJ's second reason was the inconsistency in her testimony regarding her vision and the added inconsistency of her testimony with the objective medical evidence. The ALJ obviously found it inconsistent that Maddox first stated in her testimony that she was blind, and then said that she could see well enough to drive and to use a computer. (R. 41-43). The ALJ was entitled to find that this aspect of Maddox's testimony undermined her credibility. The ALJ then found it noteworthy that Maddox testified that she was blind because her rheumatoid arthritis was in her eyes, but the consultative examiner's report was that she was developing a cataract in one eye, but had good vision in the other. (R. 41, 659-60). These inconsistencies in Maddox's testimony regarding her vision were a second legitimate reason supporting the ALJ's adverse credibility assessment. *See Harris v. Astrue*, 2012 WL 3893128 (10th Cir.) (unpublished).

A third reason cited by the ALJ for his adverse credibility assessment was that Maddox was advised to seek help from a psychiatrist as early as 2006, but at that time she refused. (R. 21, 308). The extensiveness of the claimant's efforts to obtain relief is a legitimate specific reason for a finding of credibility. *Kepler*, 68 F.3d at 391; *Hagar v. Barnhart*, 102 Fed. Appx. 146, 148 (10th Cir. 2004) (unpublished) (ALJ was entitled to consider that, if the claimant's symptoms were as debilitating as asserted, she would have sought additional treatment). Here, as in *Hagar*, the ALJ was entitled to consider that if Maddox's depression was causing her to be completely disabled, she would have sought psychiatric help. Maddox's refusal to accept a referral for psychiatric help leads to an acceptable inference that undermines her credibility.

Finally, the ALJ juxtaposed two appointments with F&CS. Maddox saw her case manager on October 1, 2008 and stated that she was having vision problems and could barely

walk due to severe pain. (R. 646). Two months later, Maddox canceled an appointment because she had to take her car in to be fixed. (R. 648). The ALJ was entitled to find these two appointments to be in contrast, because Maddox was describing her condition, including her eyesight, in bleak terms on the first occasion, but on the second occasion was having her car fixed, which called into question the true degree of severity of her condition, especially regarding her vision, on the first occasion.

These are all legitimate reasons for a finding of limited credibility, and they are affirmatively linked to substantial evidence. In her attempts to weaken the ALJ's adverse credibility assessment, Maddox addresses the topic of activities of daily living. Activities of daily living were discussed by the ALJ in relationship to the Paragraph B Criteria, but they were not a basis for his credibility assessment. (R. 17-21). Maddox's arguments in this regard are therefore not persuasive.

Maddox also attempts to undercut the adverse credibility assessment by stating that the ALJ did not adequately address Maddox's medications and their side effects. It is true that medications and side effects are important factors that should be discussed by the ALJ in assessing credibility. In *Sitsler v. Astrue*, 410 Fed. Appx. 112, 117 (10th Cir. 2011), the Tenth Circuit discussed earlier precedents related to medications and found that the ALJ had erred in failing to discuss the claimant's consistent use of pain medications. The Tenth Circuit's discussion in *Sitsler* and in the cited precedents makes clear that the question of whether an ALJ's failure to discuss medications requires a remand is determined by the overall context of the ALJ's assessment. *Id.* For example, in *Miller*, the court found that the ALJ's erroneous statement that the claimant had not been prescribed pain medication did not "undermine the ALJ's thorough credibility analysis, which is supported by substantial evidence." *Miller*, 2012

WL 4076128 at *4 n.3. Here, it is clear that the ALJ was aware that Maddox had been on long-term steroid and pain medication use, but it would have been preferable for him to expressly discuss her pain medications. As in *Miller*, however, the ALJ's failure in this regard does not undermine his thorough credibility discussion.

Maddox argues that her good work record was a positive factor that should have been acknowledged by the ALJ. Again, this omission simply does not undermine the thorough assessment of the ALJ. The remainder of Maddox's arguments similarly are unavailing. "In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard. 'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011), *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

**Procedural Due Process**

Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). Maddox complains that the administrative transcript is incomplete, resulting in a violation of due process. Her argument relates to the report of Dr. Landrum. (R. 516-17). Dr. Landrum's report makes reference to an attachment in connection with his examination, but there is no attachment in the administrative transcript.[8]

---

[8] The Commissioner in his response brief attached an affidavit of the official responsible for processing disability claims, and the affidavit states that the agency's files do not contain any attachment to Dr. Landrum's report. Commissioner's Response Brief, Dkt. #22.

Maddox's due process argument lacks persuasiveness because the exhibits admitted at the outset of the hearing included 1F through 30F, and Dr. Landrum's report was Exhibit 21F. (R. 28). The ALJ asked if the record was complete and if Maddox's attorney had any objection to the exhibits. *Id.* Maddox's attorney agreed that the record was complete and said he had no objections. *Id.* Thus, with these particular facts, Maddox has waived any procedural due process arguments related to Dr. Landrum's report and any missing attachment. *Wall*, 561 F.3d at 1062 ((ALJ is entitled to rely on a claimant's counsel to present and structure the case in such a way as to adequately explore all claims); *Hawkins v. Chater*, 113 F.3d 1162, 1167-68 (10th Cir. 1997).

While the procedural posture of this case makes it possible to find express waiver, the Court is not convinced that even in the absence of waiver, the omission of attachments to Dr. Landrum's from the administrative transcript would require reversal. *See Holdsworth v. Chater*, 87 F.3d 1327, at *5 (10th Cir. 1997) (unpublished) (rejecting a procedural due process argument in a Social Security disability case, because the claimant's argument "does little to inform us of the alleged errors or of any prejudice" to the claimant). The administrative transcript contained the two-page narrative report from Dr. Landrum, and his report was remarkably similar to the report of Dr. Dalessandro. (R. 364-70, 516-17). In these circumstances, it is difficult to find that Maddox was prejudiced by the omission of Dr. Landrum's attachment. There was no violation of Maddox's procedural due process.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 26th day of October, 2012.

Paul J. Cleary
United States Magistrate Judge